21-627. Tronox Incorporated. Hold on one second. Good morning, Your Honors. May it please the Court, I'm Brian Killian on behalf of the appellants. The District Court erred as a matter of law in holding that Ashworth's claims arose after the Tronox bankruptcy because the Court failed to apply the physical events test of Texaco and Duplan. Under that test, an environmental claim arises when all the physical events necessary to establish the elements of the claim occur. And those were? Well, in Duplan, that's tortious conduct, causation, and injury. Well, I'm talking about here in Tronox. Sure, and those were the release of creosote alleged in Mr. Ashworth's complaint before 1963, and then the contamination of his property before 1996. The bankruptcy was in 2000. He alleges that his property was contaminated before 1996? Correct. He alleges that it was contaminated sometime between 1984 and 1996, which is 13 years before the bankruptcy. Okay, and that's paragraph one of the complaint? 41. Most of these facts, Your Honor, I can give you a couple of paragraphs, but the key one is paragraph 41 of the complaint. Yep. So those are, as this Court said in the Duplan case, as long as you have tortious conduct and causation and injury, all three of the facts alleged in Mr. Ashworth's Louisiana complaint, then you have an accrued claim under the Duplan standard. The district court, and as I said, this is not really meaningfully disputed in this case. The district court didn't disagree with our application of the physical events standard. The district court believed that a different test applied for determining when Mr. Ashworth's claims arose. The court purported to apply the contact or relationship test from this court's decision in Motors Liquidation I, but there are three problems with what the district court did in applying that test. First, the contact or relationship test is for contingent claims, that is, claims where there is no pre-petition injury, where the injury happens after the bankruptcy. But in Mr. Ashworth's case, he alleges a pre-petition injury when he alleges that his property was contaminated before 1996. Second, even if the test were to apply in a situation like this, the contamination of Mr. Ashworth's land satisfies the test. As this court recently said in the John Manville case that we cited in the 28J letter, exposure constitutes the contact or relationship, and that is exactly what we have argued in this case. The exposure of his property to creosote, as he alleges, before 1996 constitutes the contact or relationship. Or to put it in a different way, the way this court said in the Chateau Gay decision, that a relationship is one that is known in the law. Well, a relationship in tort arises from a tortious injury, as he alleges here. There is no additional contact or relationship required beyond the exposure. Isn't that a bit circular? I mean, the relationship always exists whenever there's a tort. Absolutely right. I don't know. I call that circular, Your Honor. If I encounter a random person on the street and injure him, then I now have a relationship to him. And so it gives rise to the tort. So that is exactly what the standard is driving at. When you have tortiously injured someone, there is a relationship. That is the type of relationship, in other words, that the court is looking for when applying the contact or relationship test. Well, environmental claims are difficult in some ways because of the fact that they're not always they may be knowable, but they're not always known because of the fact that it's subsurface water pollution. That's correct. And so the problem becomes clearly, I mean, the difficulty we have with a lot of these is that there's a disconnect between the definition of claim and when someone might be able to bring a cause of action to collect on what the state law, how the state law defines a cause of action, and it's different from the idea of claim. In trying to sort all these things out, the cases seem to work on, did the debtor do something that ultimately injures the claimant? That's the problem with Tronics, and that was the problem with Tronics 4 because the claimants tried to, the plaintiffs tried to recast their claims as to acts of new curve of gain. Correct. And Judge Etkin, I think, got that right in terms of his understanding of what we were trying to work on. And so they were trying to cast it as conduct post-petition. In the Tronics 4 case. And that's the problem in old GM, is their conduct post-petition by new GM. Correct. For which the free and clear order didn't give them free and clear. Exactly. But in this case, there's no such. And new GM sat on the defect and didn't disclose it. Until five or six years after the bankruptcy. And so their conduct then exposed them outside of. The debtor's conduct, yes. Correct. So the critical question here is, is his allegation, well two critical questions to my mind. Okay. Is this allegation that appears at page 108 of the joint appendix where he asserts. Paragraph 41, yeah. The timing of his injury. Yes. He's the one that's made these statements. So your claim is, okay, then that's clearly pollution caused by the debtors. He's exactly right. And to be specific, the debtors who own the property before 1963. Because it's 30 years pre-final judgment, right? 13 years pre-petition. 13 years pre-petition. Yes. Yes. At the latest. All right. And so it's easily then traceable to the act not of a successor. That's correct. Only the Tronics debtors, former selves, owned and operated the DeRitter facility. As the complaint itself alleges in paragraphs 5, 6, or 7. Here's my problem. Okay. How does he know? How does he know that he has to file a claim before the bar date? Well, that's a question of due process, Your Honor. I do think that's a distinct issue. Because if the notice is still good, then there's a problem with the extinguishment of his claim. Because there's always – I've had enough of these. They drive me crazy. So there's always a question of do they have a claim? Step one. And that's where Judge Atkin – That's what we work out in Tronics and we work out in other cases. Old GM works it out nicely, does a very nice job working through it. As does DuPlan. And Chattagay does a nice job with it. Okay. But then there's a separate question. All right. So they did have a claim. Yes. But then the question is were they made aware of it? Because somebody doesn't always know the debtor. Well, can I tweak Your Honor's question? Because I don't think the due process question is whether the debtor had an obligation to make the creditor aware of the creditor's claim. Under Mullane, the standard articulated there, it is the debtor's obligation to try to make others aware of the bankruptcy proceedings. Now, there are many reasons – I agree with you there. I agree with you there. But let me ask you this. If the reason that he knew that his property had been polluted in 84 or 96 was because in 2020 a hydrologist told him this pollution has been going on for a long period of time. Yes. Not that he actually knew in 84 or 96, but that he knew he was subsequently told that it was that. Now, it's still a claim. Correct. That still puts it pre-petition, right? Absolutely. Right. But does he know in the sense of that a notice then would trigger in his mind that he should file a claim? So I'll walk through the analysis this way, Your Honor. Because he's five miles away. I keep thinking of it. I sold my home a few years ago, and I moved five miles away, and that seems like a hell of a long ways to me. It's a distance, Your Honor, but depending on the nature of the contaminant, it may not be that big. So I don't know that there's something magical about the specific distance. I'm going to walk back to your question on due process in a moment because I do want to point out in the Texaco case itself, one of the families there – I'm aware of that, but that's a bankruptcy court, and they're interesting but not binding. Well, other than that, it was fully endorsed by this court in in re due plan, and I just would point out one of the families there lived two miles away. Yeah, I'm aware. It's 2.1. Just about, and had no other contact with the debtor except for the pollution underneath the land, and the bankruptcy court admittedly, not this court, held that the claim was a claim and that that person was entitled only to publication notice because he, at the notice level – He was in conjunction with oil production right then, right? Yeah, they were PCEs. Oil extraction. Correct, correct. That navigated – Oil extraction in the general area in which they lived. 2.1 miles away, Your Honor. That's a pretty big distance, too. This is a fellow living in someplace near DeRider, Louisiana, wherever that is. Correct. And he's five miles away from a plant, and the question is did he know or should have known or – Well, there's a question, to my mind, on the notice side, not so much maybe so much – On the claim side. Okay, so if you want to talk – The question of knowledge typically comes up in the context of a statute of limitations or prescription under state law, and there's going to be more to that inquiry than just when did he flip over the stump in his land and find creosote. There will be a question, for instance, that the DeRider site was listed by the Louisiana Department of Environmental Quality, according to his own complaint in the 19 – The question of detectability. I'm sorry, Your Honor. Of detectability. The detectability is a distinct question from whether he had an awareness of what was potentially under his property at the time. There's never been a dispute in this case that it was detectable, and indeed he alleges in his complaint that creosote was actually detected at the DeRider site and that the migration was detected. He alleges in his complaint that DeRider's principal drinking water supply was known and found to be contaminated in the 1990s. So to Your Honor's question about five miles, you know, I don't think we need to decide that right now in this case, but if we had to talk about knowledge, there's going to be evidence that there was a general awareness in the community, which may very well have been enough to put him on notice. For due process purposes, the question ultimately looks at the debtor, right? The debtor's ability to provide notice. And as the Third Circuit held, we think persuasively in the Chemitron decision, which involved, I'd say, an analogous situation with a uranium radioactive site that was near a residential neighborhood. Many years afterwards, it became clear that there was a potential for radioactivity, and there were claims brought not just by the residents of the neighborhood, but by their occasional visitors. There was no way that they would have known. Some of them, I think, had actually moved away to Texas at the time, according to the Third Circuit's decision. And in the practicalities of bankruptcy at that point, there's a possibility of a claim. We don't know. It may be specific because I don't represent the debtor. The debtor doesn't know what other people know or don't know. All the debtor can do is put out a publication notice. And in this case, the publication notice, as both Judge Gropper found several years ago and as Judge Wiles recently found in the 2021 decision, where he resolved some claims brought by 38,000 other late claimants, was massive. There were 80 local newspapers. 66,000 notices, I think. Correct. There were national newspapers. The federal government put this in the Federal Register, which all of us citizens are presumed to have notice of, because the federal government was involved in this settlement as well. The notice campaign was extensive. So, you know, do we know why he didn't bring the claim? Maybe he knew about it and chose not to. Maybe he didn't get the notice. But that's sort of the practicality at the end of the day in bankruptcy, that there are some people who will not bring their claims and yet to achieve the finality that bankruptcy desires so that the debtor can move on and know what is and is not discharged, some people who did not participate are not going to have their claims. But as you point out, this is not a claim against the debtor. No, it's not. He mentions the debtor in his complaint. Two of the defendants identified in the complaint are the debtors. And then he is now also sued in a darko and occidental as the debtor's successors. But, yes, it's true. We're dealing sort of with this hybrid situation where you have the original bankruptcy and then the adversary proceeding that came a few years afterwards. Would you agree with me? Well, I don't want to ask you to agree with me. Let me ask you this question. If the pollution didn't reach his property until after the petition, such that his injury occurs post-petition? It would be a contingent claim at best, yes. It would not be covered by in re du plan, which requires the pre-petition injury. So his claim would not be against the estate. It would be against the successors? Well, I think it would be. If the estate ceased to exist, it would be. Successor liability, it works when the only acts are the acts of the predecessor. Correct. And the injury occurs. Correct. But when the acts may be pre-petition, pollution, but the injury is post-petition, in other words, the pollution doesn't reach his property until 2022. Sure. That's a classic contingent claim, like in the asbestos scenario, where someone inhales a fiber that was put in place by an asbestos. So even if he'd rather notice, he didn't have a claim at that moment in time? Well, he had a contingent claim potentially if there was a contact or relationship, as indeed the court just recently held in the Johns Manville case. Well, in pollution cases, the contact relationship, that analytical paradigm doesn't work for me. I mean, I understand it when you're buying something. But when you're being exposed, when you've got an exposure that's not seeable, it's underground, it's insidious, and my hypothetical is specific to post, the pollution occurs post-petition. I understand. So I'll take your hypothetical, but if I could get back to my other point. In your hypothetical, we would not be able to demonstrate the in re du plan standard because the third factor, detectable pre-petition injury, you're taking away in the hypothetical. At that point, I think we would be at best in the contact or relationship standard. Was there something else that would have created the contact or relationship, as in, say, the Texaco case or other cases where there were commercial relationships involved? So it's not just because we failed to plan, and we don't, but if we failed to plan in Your Honor's hypothetical, it's possible that there would still be a claim in a bankruptcy sense, because it would be a contingent claim in that scenario. Could being a neighbor be the kind of relationship that would matter in this context, rather than, say, who bought a used car? Could being simply close to the property? I don't know that- Being a neighbor. I mean, why wouldn't that substitute? I mean, why wouldn't that be the kind of relationship that would give somebody notice that they could be suffering the harm? So in taking the hypothetical of there's no contamination of the property, but you know what's happening on your neighbor's property, then I think we would argue that that would satisfy the contact or relationship standard. And indeed, I believe- Because exposure is sufficient contact. Absolutely. Yeah, but in the hypothetical that I've been asked, exposure's been taken away. There's no pre-petition exposure. So I'm trying to give you an example of what would satisfy the contact or relationship test when there is no exposure. Exposure's a great case for contact or relationship. Well, yeah, that's the asbestos cases, like the case we- It is. So I wanted to- Close petition, okay. Yes, exactly. So I wanted to take Your Honor's question about the analogy and why environmental cases I don't think actually are that different from asbestos cases. I concede that the contamination will be subsurface, but like asbestos, the inhalation of asbestos fiber is basically unknown to the individual until he or she eventually develops something like asbestosis or mesothelioma. Indeed, there's really no way to determine- Unknown and unknowable. I gather that's the case. I don't know enough about asbestos science, but when someone takes in a fiber, it is quite possible that they will live to be 90 years old and die of natural causes and never develop any of the injuries that give rise to a torsion injury. Oh, but they're more likely to know about the exposure. Well, that's true with regard to the wives sometimes, but the husbands who come home from the Brooklyn Navy Yard, I tried a dozen of those- There are easy and there are hard cases, yeah. And then the case that we just had a couple months ago. Mrs. Berry's case. But there I realized that the injury is not knowable for a long period of time because it's cumulative, but at least it's knowable about the contact with the agents, the agency of injury. And so you're working in a place, John's Mansion plant, and the fibers are all over the place. Absolutely. It's easy to know when you get notice of the fact that you work there that you should file a claim, but this is different in the sense that it's subsurface and it's five miles away. But it's knowable. I think that's the key point. It's knowable. If you had tested, it would have been there. It's not like the asbestos case. Let me ask you a question. Do you know what's going on underneath the property in your home? Only in a few small spots where I have a well, but I take your honor's point. But it's knowable. I could look, and that's the key difference. And if I can give you a hypothetical that- You could look because somebody says you're noticed that in the newspaper that says, oh, there was a creosote plant five miles away. You might be concerned about it. Sure. That's one reason why, but there may be other reasons why. But guess what? What if you looked when you got the notice? What was the year of the notice? Of the original bankruptcy, the bar date was in 2009, and then the injunction was 2014. You got the notice, and you had a test done, and the well tested negative. And now, in 2014, your well is filled with creosote. That's still a contingent claim. That's the hypothetical we just went through where the exposure happens after bankruptcy. So you got notice. What good was the notice? Well, you may not have a claim depending on whether you had a contact or relationship besides the exposure. I would suggest you had no contact or relationship, which helps you a little because you didn't have a claim until your well was filled with creosote. But I think, Your Honor, it's going to be case-specific, right? There are community meetings about things that are happening. I grew up in a town with a Superfund site that was not near my house, but I knew it was a Superfund site because it was a small town. There are things that can put people on notice within any community, big or small, and I think you would need to go case-specific in those situations. But if I could, Jordan. I'm going to give you one minute from your friend, and then you've reserved some time. I reserved two minutes for rebuttal. I'll try to do a brief, very brief wrap-up for Your Honor. So we think his claim arose as a matter of law before the bankruptcy, and two conclusions follow when the court corrects Judge Atkin's mistake. First, his claims are clearly enjoined as pre-petition claims. And second, the due process problems that Mr. Ashworth has actually raised are only due process objections that are based on trying to enjoin a future claim, enjoin a claim where there was no pre-petition contact, exposure, or injury. But since he had a pre-petition injury, the only due process arguments that he has raised all fall away. And for that reason, we think that the court should reverse and remand with instructions to enforce this injunction. I appreciate Your Honor's questions. Good morning, and may it please the Court. I'm Andrew Glenn of Glenn, Ager, Bergman & Fuentes, representing the appellee here, Larry Ashworth. The District Court properly held that the 2014 injunction entered in the Torontox bankruptcy did not bar Mr. Ashworth's claim stemming from the black toxic creosote he discovered on his property in 2019 after he removed a tree stump. How did he make the assertion that his property was damaged from 84 to 96? After, I believe, 2019, there was a community meeting where it was disclosed that this pollution had occurred. He hired a lawyer who brought this complaint, and the lawyer did the investigation about the timing of the plume of water carrying the creosote to his property. As Your Honor correctly observed, all of this is beneath the surface of his property. He didn't see it until he removed that tree stump in 2019. But his injury is pre-petition. The contamination- Let me finish. The injury is the pollution, so his injury is definitely pre-petition, as he's alleged. The contamination was pre-petition. Correct. Whether that's injury, I think that's a different point. How far below the surface was this creosote? Is it an injury if it's 200 feet below the ground? You're saying the contamination of his property was pre-petition? Yes. Yes. I don't think there's any dispute about that. It's in the complaint. But I think what the distraction of this case, what my colleague wants you to do, is to abandon the other part of the GM case. The GM case does not specifically say only that a claim arise pre-petition. It also has to result from pre-petition conduct. Further, there must be some contact or relationship between the debtor and the claimant such that the claimant is identifiable. So, on the one hand, they get the benefit of the publication notice in the bankruptcy. They don't know who Mr. Ashworth is. The law says all they have to do is publish a notice in these newspapers. Fine. That's on them. But there's a bilateral identifiability issue here. For Mr. Ashworth, he has to know that he has a claim, so he has the ability to do something meaningful with that claim in the bankruptcy. And what my colleague is asking Mr. Ashworth to do is what Judge Leslie intimated. He bought a house. Does he have an obligation every week to drill down below to see what's there every month, every year? Mr. Ashworth, this is not in the record. This town in Derrida, Louisiana, the median income is $25,000 a year. You're telling these people that they have an obligation all the time to detect unknown contaminants from some unknown location five miles away? There's no authority for that. If you look at the DuPlan case, you have adjacent landowners. They're looking at a Texaco site or whatever it was on their land. Texaco files for bankruptcy. I'm an adjacent landowner. I know something might be going on there. Maybe I better look. Right? In Johns Manville, I'm sorry, in the other Texaco case, excuse me, the claimants there had royalty contracts with the company. Okay? There's language in that opinion, Your Honors, that the tar pits or the oil pits were open and notorious. The land everybody was residing on was an oil field. Okay? So there has to be a rule of reason here governing what the claimant has to do. If the information was available to your client back at the time of the petition, presuming, so your first assertion is that the injury, that the conduct that causes this injury, even though it's a pre, you'd acknowledge it's got to be- Yes. Yes. Okay. So then the question becomes, in your view, and to kind of fit within the context of General Motors or the concerns that are expressed in General Motors, which I think are legitimately nicely laid out, is did he know of it or did he have some way of knowing it? If there had been some kind of monitoring process of local wells at that point in time and the plume were detected, the fact that he didn't test his own site doesn't excuse him from being able to know, does it? Well, that's not in the record, so let's be clear about that. No, no, no. Don't fight that. Okay. I think you're right, and that goes to the asbestos cases. Okay? If you look at the Berry case, which Your Honor was on the panel of, the opinion in that case acknowledged the GM and identifiability as a law, even in asbestos cases. Right. So if you look at the lower court's opinion in that case, Ms. Berry's husband worked from 1973 to 2010 at an asbestos plant. I mean, there's some relationship. for that claimant to know, hey, I have a claim, I have to do something here. And the other thing about asbestos that I think is really particularized, which is, I don't think there's ever been more publicity of any toxic tort in American history other than asbestos. People have known about the dangers of asbestos since the 1980s. So if your spouse, your child, your roommate worked at an asbestos plant, there's some objectively reasonable basis where a court could say, hey, you know, this is like the monitoring site that Your Honor is saying. Some people around you know. There's a basis for you to know. But it can't be the law that, and this is all that they argued was this detectability standard, that you have some ongoing obligation to drill into your property to see if there's a bankruptcy that occurred from a plant that's five miles away from you. And those are the facts before the court today. Did they press the district court for discovery? They did not. To determine what was the knowledge base in the locality? Because the DeRider site was declared a Superfund Site 91, right? One of the two sites, parcel B, was declared a Superfund Site. I had some experiences in my former life as a state representative. And there were monitoring wells that were then put in place, and we looked at the DeRider designation. It's mentioned in, I think it's one of the sets of papers here. And so there's monitoring there, but that's the site that's five miles away. There's nothing else, though. I didn't see anything else in the record identifying any other kind of, well, there is one mention of a municipality's water system having some kind of difficulty. And when was that? I don't know. I don't know. I'd have to supplement. I'm sure your mom is going to tell us. I'm sure he will. I'm sure he will. But I don't think, to get back to the holistic point here, I don't think there's anything in the record that would suggest that there was anything, any of that kind of information available to Mr. Ashworth, such that he would have the ability to have the notice required, like the asbestos claimants, to go to the bankruptcy court and have the ability to assert his claim. He doesn't have to know that he can sue on the claim. It's just he has to know that he has the potential that something that they did might have affected him, right? Because the term claim is disconnected from a state cause of action, right? I think what you're driving at is he may not have injury at the point, but if the conduct occurred pre-petition and it touched him in some way, then you have the issues that I think you're talking about. But GM goes beyond that. And there's other cases that it acknowledges talking about, and Shadow Gay talks about this, you know, we shouldn't interpret these laws, the application of the claims laws, to achieve an absurd result. And I understand. Judge Newman's 10,000 bridges. Exactly, exactly. And, you know, I think we can all speculate about what, you know, a monitoring site or other indicia that he might have had a claim that maybe he could have seen. None of that's in the record. The record is, yes, there was a Superfund site. All he knew, he pulled up a tree stump, he saw the creosote, that was it. And what they want to do, which I think they're walking away from now, they went into before the Johns Manville decision came out. They were espousing completely this detectability argument, okay? And so if that's really what they're saying here, okay, the only basis for detectability here would have been if he had hired someone to perform the scientific tests that they talked about in Texaco. So how would he know? No, if it was capable of being detected and he had some reason to look, then the fact that he didn't is on him. But that's, I mean, I don't know that the record shows that that's the case. Exactly, exactly. So you get there either way. He's got the burden. They do. Yes, yes. They want the benefit of the injunction. They've got the burden of showing that. Identifiability. All right. Well, identifiability meaning detectability. Detectability, to identify the claim. To identify the claim. It's capable of detection, but when do you have the obligation to detect? There's nothing in the record that explains that Mr. Ash, yes. Not now, but should have. Yes. All right. That's all I have unless the court has further questions for me. Thank you. Thank you, Your Honors. A couple points. DuPlan articulates the physical events test. That's the test that you want us to apply. Correct, because it's an environmental claim just like this one. There is no case in the context of a claim that says you have to ask whether the claimant should have knowledge. So the first question is what test to apply. Correct. You say physical events test. Correct. They say, you know, the worst case scenario for them, the context and relationship test, and you think you can still prevail under that test for the reasons that we've gone through. You have accurately stated our case. Yes, that's right, Your Honor. But the point I want to emphasize is that the physical events test does not have a knowledge component, and it does not have a should-have-known component to it. Now, Your Honor asked my adversary about – So it does not have a detectability. Well, detectability in the court in Texaco – So obviously I've asked about detectability three times. I'm really interested in it. I'm sorry. So as the court in Texaco described, detectability means capable of detection by a scientific means, not whether you should have gone out and done the test. It's a factual question as to whether it was possible to detect. It's about potential. And is that coterminous with a physical event? Absolutely. Regardless of how far – Go ahead. Have we said that? In the context of analyzing the physical event standard, have we said that capable of detection, that is this detectability standard, is the same thing? There's really no – That's how we understand the Duplan case. What the standard is trying to do is to prevent a new technology that may be discovered in 100 years from being retroactively sort of imposed on people who lived at the time. But the question is whether it was capable of detection because if it were capable, then the person had the right to a cause of – had a right to payment, which is the language that Congress used when it wrote the definition of claim. It's a right to payment. It's not why didn't you bring the claim. It's could you have brought the claim. Don't you get – But this is so unfair. I mean, I – Your Honor, fairness is a – Wait a second. I'm sorry. That's terrible for a judge to say. I mean, but think of it. Five miles. How about 10 miles? How about 20 miles? Your Honor, if it was there, the claim existed. That is what Duplan says. 20 miles, 100 miles, if it was there, the claim existed. So I open up the Oneida Daily News, which you noticed it. You actually sort of noticed it in the New York paper. It was incredible, yeah. Okay. And I look at this, and I live 35 miles away from the Sinclair Refinery in Wellsville, New York. I live 35 miles away, and it says, oh, there's pollution. Yes. There's pollution in the water around Wellsville, New York, right on the edge of the Genesee River. And I said, well, hell, I live up in the town of Anaheim. It's 30 miles away. I'm safe. I don't have to worry about that. But I got noticed, so now even – And it's detectable, and it's there. Yes, exactly. I'm in the estate, and I should know. You are in the estate because you have a claim. Because you have a claim. Congress wrote, as the Supreme Court has said, and this court has endorsed several times, Congress wrote the broadest possible definition of claim into the code. And so if you take the physical events test at what it says on the face of its decision and not add a reasonableness or knowledge component on top of it. Can the definition of a claim be modified by the terms of the injunction? In some bankruptcies, there are precedents. How about here? Not in this case. It just defined claim in the way the bankruptcy law has defined the term claim. So trust derivative claim is just the way that it's defined? Trust derivative claim, which we have in the addendum to our brief, is a multi-paragraph, long definition. It doesn't make sense to me, but go ahead. You have to put a lot of commas in as you read it, Your Honor. It's a very long-winded, multi-phrase definition. But, yes, the definition of trust derivative claim does reflect the bankruptcy definition of claim. And how do I know that? I'm sorry? When you say that, what do I, when you say that it reflects the bankruptcy definition, how do I know that from the definition that's in the? Sure, because it's defined to include claims that were or could have been brought by the litigation trust. And the claims that were or could have been brought by the litigation trust are claims that are bankruptcy claims. And does Louisiana law play a role at all in this? Well, under Louisiana law, Mr. Ashworth had a claim. The law of Louisiana, the quick decision, which we cited in reply brief, says that a claim accrues when the injury happens. Now, Louisiana, as a matter of its legislative grace, has given its citizens a long prescription period. That's Louisiana's statute of limitations law. So that when they have reasonably should have known about the claim, that's when the clock starts to tick. But the court said it's undeniable that when you are injured, you have a claim, which is why the DuPlan test isn't really innovative. It's just reflecting the basic law that I think exists in a lot of states and certainly exists in Louisiana. The claim was there even if he didn't bring it. And I want to bring your honors back to Motors Liquidation 1 because we've not talked about the language in the decision there. The court was very clear that a person can have a claim even if unknown. That means you don't have to know it. You have the claim. The claim exists for physical objective standards because Congress made a policy choice. As I said, it wrote the broadest possible definition of claim so that debtors could have a clear discharge and be able to move on from all of the injuries that they caused in the past, whether the debtors knew about it or whether the injured victims knew about it. That is the way that Congress wrote this. So we believe the only way that Ashworth can prevail in this case is if— In the Motors Liquidation decision? Well, part of— I think it's—the question is whether it's limited to claims of post-petition injury caused by pre-petition conduct. So I'll be specific what I was talking about, Your Honor. I was talking about the court's discussion of the economic loss plaintiffs, which are people who owned cars before bankruptcy, did not know about the defect, but then suffered economic losses, which the court described primarily as the cost of paying for repairs after bankruptcy once the defect was revealed. And for those individuals, the court said, yeah, you had the car. Even if you didn't know, you had a claim. You had a claim. And so I think that's our point on the environmental contamination, though. The defect was—you're right. They didn't know. They didn't know that they had a claim. And the same thing with Mr. Ashworth. He had a claim. Did he know? He alleges he didn't. But even if he didn't know, this court has held that he has a claim. So my point, Your Honor, is that we think the only way Mr. Ashworth can prevail is if In re Duplan is overruled. On motorist liquidation, did we not refer to the contact with the ship test? Absolutely, because there was no pre-petition injury. That's what distinguishes Mr. Ashworth from them. So to be clear, Judge Loyer, we're talking—I'm taking the assumption that the court is not going to follow Duplan and instead is going to apply motorist liquidation one. Well, even then, the court was explicit, was plain, that you can have a claim even if you don't know. Knowledge doesn't matter. He had a claim. We ask that the court reverse and remand with instructions to enforce. All right. Okay. Thank you very much. Rule of reserve decision. Thank you very much. We'll have the argument next in SEC v. Govender. I understand that the attorney for the SEC is on video on Zoom. Safe journey, Counsel. Safe journey, Counsel. And Mr. Govender. Nicely argued, Counsel. Oh, yeah, got it. Thank you. Good to see you. So, Mr. Govender, you can come up to the podium. And you've reserved one minute for rebuttal? Yes. So thank you for allowing me to speak today. I consider it a privilege to be here. So my case now is going on 10 years. And the chronology matters here because in light of the jurisdiction and the maneuvering, the SEC in New Jersey, secondarily in light of Newman and Solomon, and by way of statute, and also by way of fact. So on those four topics, I'll give you a little background. This case originated and I was brought in to help out with the SEC's investigation. I never was employed by any of the other co-defendants. This case came in New Jersey civilly. I was never named in that action. Even though when you read the SEC complaint, it says that I was implicit in what the co-defendants were doing. Judge Shipp terminated the case after four years and administratively terminated it. And given no case moving forward in New Jersey, the SEC then filed in the Southern District, given the reason that I lived in Manhattan at the time, as good reason. And the fact is that none of the entities that were involved in any trading I was affiliated with, they were all affiliated with the co-defendants. They were all in other states. The SEC could not move their case in New Jersey because of Judge Shipp and decided to file in the Southern District, thereby naming me. I was never named prior. I was never named in any of the action by United States attorneys. I was an analyst at the time, and I was very proud of my analysis. I've included in the brief 40 pages of my analysis of the particular stock that the SEC is honing in on out of several hundred, if not thousands, of trades that I consulted with other companies, including this one. There are certain material facts that the SEC blatantly lies. JA-17 is trying to link me to their insider scheme of front-running. There are 1.3 million documents and 50,000 emails that the U.S. Attorney in New Jersey uncovered. I was never named, only until- There's a consent judgment. There's a consent judgment. So you consented. Yes, Your Honor, and it was a mistake. The SEC, with their maneuvering and booing, and I am an attorney at the time. It was never negotiated. Are you arguing coercion or- Absolutely. Absolutely. So you want to undo this consent judgment? That's correct, Your Honor. It was never negotiated. There was never any time for any other evidence to the SEC. I was never served a wells notice, ever. You don't have to be served a wells notice. I understand. By law, you don't have to, but in almost every instance. And I'm an analyst by training. It took many years to build my reputation. And, you know, in terms of the SEC disclosing my name, they called me an Associate A. And by association, it was very difficult after that to continue my career. And so when they named me in the suit, it was really the end of my career. Of the several hundred, if not thousands, of cases of insider trading over these years, there are only a handful of analysts that have been named, maybe three, in that time period. And so I've included my analysis. I have also included some errors in the SEC's submission to Judge Carter about my finances. In any case, I think that the SEC overstepped their jurisdiction, should have left it to Judge Shipp in New Jersey. None of these operations and alleged insider trading were done by me or in the state of New York. So you've reserved some time for rebuttal, Mr. Govender. And so we'll hear from the lawyer for the SEC, and then we'll come back to you.  Mr. Alvarez. Good morning, Your Honors. May it please the Court. Paul Alvarez for the Securities and Exchange Commission. Your Honors, as the commission has set forth in its brief, Mr. Govender's challenges to the consent judgment below are not properly before this Court, and in any event are without merit. I know he mentioned coercion, but I would point this Court to JA 67, Mr. Govender's consent agreement, in which he stated that he entered into this consent voluntarily, and represents that no threats, offers, promises, or inducements of any kind have been made by the commission. Furthermore, with regard to the district court's civil penalty determination, that was a reasonable exercise of the court's broad discretion in fashioning such remedies. And unless the court has any questions, the commission would ask that the district court's judgment against Mr. Govender be affirmed. Well, when you say affirmed, you said that we don't— Usually that would mean dismissed. Sure. I'm sorry, Your Honor. I apologize. Dismissed. Yes. And with respect to the civil penalties issue, affirmed? Yes. Yes, sir. Okay. Thank you, Mr. Govender. Thank you. So, Mr. Govender, you heard the lawyer from the SEC reference a particular paragraph in that consent judgment that says you were not coerced and, you know, no one put anything to your head. The SEC has continued to coerce me. In 2019, I was trading a name, public name. I happened to know somebody on the board. They did an investigation and threatened them for a complaint against me. It went nowhere. It really, in terms of the SEC's far-reaching power and the ability to state facts that are not facts, has dismayed me. I mean, now it's been eight years. It's been 10 years next year. That's 50 percent of my career, over 20 percent of my life. And the SEC—yes, I did sign it, Your Honor, and it was a mistake. And, you know, I think that under no negotiation or challenge to that consent degree by my lawyers, even though I didn't want to sign it, they asked me to sign it. So I think that the SEC has gotten their fair share. If I was guilty of anything, it's to be associated with some bad people who went to jail. They were fined $55,000. The SEC, by maneuvering out of New Jersey into the Southern District, is a very—I haven't heard of anybody doing that. I haven't found any cases of where a judge terminated the case and they refiled somewhere because somebody who was affiliated, not named in any other case criminally, to file a civil case in the Southern District. They continue to monitor me. They continue to coerce me, especially on this trading where I knew somebody there. And the only reason I know is because this individual was on the board as a friend I went to college with and we were on the same community service organization. And I just want to say one more thing. If there were any insider trading, you know, I didn't hear about it. I was never named. Newman was from this particular court in 2014, and none of those cases were dropped. And, you know, my case was, you know, somehow brought about. It's not all the cases that were dropped. Not all, but a lot of them were. None were brought back. Thank you very much. We'll reserve a decision, which just means that you'll get a decision from us at some point after today. Thank you for your time. Thank you, Mr. Alvarez. I believe that that concludes today's argument calendar, and I'll ask the courtroom deputy to adjourn the court. Thank you. Court is adjourned.